IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JEFFREY PRUETT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| BLUELINX HOLDINGS, INC. | ) | _____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

**I.   INTRODUCTION**

1. This is a complaint for equitable relief and damages arising from the retaliatory firing of Plaintiff Jeffrey Pruett ("Pruett") from his position as Compliance Manager for Defendant BlueLinx Holdings, Inc. ("BlueLinx"). As is more fully described herein, Defendant terminated Pruett in retaliation for his reporting, both internally and to the Public Company Accounting Oversight Board ("PCAOB") and the Securities and Exchange Commission ("SEC"), activities that he reasonably believed to be violations of the Sarbanes-Oxley Act ("SOX"), 15 U.S.C.A. § 7201, et. seq.; the Securities Exchange Act of 1934, 15 U.S.C.A. § 78, et. seq.; and SEC rules and regulations. Pruett seeks an order

declaring his termination a violation of the Whistleblower protections afforded him under the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C.A. § 78u-6, et. seq., injunctive relief restoring him to his former position as Compliance Manager; and damages to compensate him for all harm—including liquidated damages—arising from Defendants' wrongful acts.

## II.   JURISDICTION AND VENUE

2.   This Court has subject matter jurisdiction over Plaintiff's claims, which turn on questions of federal law. 28 U.S.C. § 1331.

3.   Venue is proper in the United States District Court for the Northern District of Georgia, Atlanta Division, because the Defendant resides therein and the events giving rise to this Complaint occurred therein. Venue is vested in this Court pursuant to 28 U.S.C. § 1391(b).

## III.   PARTIES

4.   Pruett is a citizen of the State of Georgia and a resident of Paulding County, Georgia.

5.   Defendant BlueLinx Holdings, Inc. is a publically traded foreign corporation authorized to do business within the state of Georgia.  They may be served with process through their registered agent, CT Corporation System at 1201 Peachtree Street, NE, Atlanta, Georgia 30361.

## IV.  FACTS

6. Pruett has worked in the corporate governance field since 1993. He has a B.S. from The University of North Alabama, and a *Juris Doctorate* from Birmingham School of Law. In 2010, he earned his certified fraud examiner's certificate from the Association of Certified Fraud Examiners.

7. From March 1, 2010 until his termination on May 13, 2013, Pruett was the Compliance Manager for Defendant BlueLinx.

8. Prior to becoming Compliance Manager for BlueLinx, Pruett worked for Miller Advisors[1], a consulting firm, from March 2007 until March 2010.

9. In the three years immediately prior to his employment with BlueLinx, Pruett served as a consultant to BlueLinx on behalf of Miller Advisors, and then Hancock Askew & Co., Inc. In his role as a consultant to BlueLinx, he created and administered BlueLinx's Sarbanes-Oxley Act ("SOX") compliance program, insured that BlueLinx remained compliant with SOX by managing that compliance program, performed compliance audits across the country, and coordinated with the company's outside auditing firm.

---

[1] Miller Advisors merged with Hancock Askew & Co., LLP ("Hancock") in June of 2008. Despite the change in the name of his employer, Pruett continued in his position servicing BlueLinx for Hancock after the merger until he left in March 2010.

10. In March 2010, BlueLinx hired Pruett as their full-time, in-house, Compliance Manager.

11. In his role as Compliance Manager for BlueLinx, Pruett continued to manage and administer BlueLinx's SOX compliance program, perform audits across the country, and work with the company's outside auditors.

12. BlueLinx is subject to the requirement of SOX as a publicly traded company with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78l.

13. BlueLinx has over 2,500 employees in 60 locations throughout the United States and Canada and a current market cap of $180 million.

14. In January 2012, during routine, mandatory, testing of the 2011 stock based compensation that had been paid by the company, Pruett found that the stock based compensation that had been paid to BlueLinx's Chief Executive Officer, George Judd, exceeded the amount that was approved by the company's Compensation Committee.

15. These results indicated to Pruett a clear internal control failure.

16. Immediately upon receiving these results, Pruett asked a fellow auditor, Joe Lynch, to double-check his findings.

17. Mr. Lynch confirmed Pruett's findings.

18. Pruett then reported his findings to BlueLinx's Financial Reporting Manager, Erin Yancey ("Yancey").

19. Immediately, Yancey walked with Pruett to report the issue to Scott Phillips ("Phillips"), BlueLinx's Vice President and Chief Accounting Officer.

20. Pruett and Yancey reported this internal control failure to Phillips, and showed him the internal control testing report.

21. Following a short discussion about his findings, Phillips demanded that Pruett leave the report with him, and informed Pruett he would further investigate the issue.

22. Under Section 404 of SOX, BlueLinx is required to monitor for internal control failures, and any internal control failures discovered by the internal auditors must be reported to the external auditors.

23. Pruett informed Phillips that as a documented internal control failure, these findings should be reported to BlueLinx's external auditors at Ernst & Young ("EY").

24. Phillips demanded that the issue not be reported to anyone at EY, and stated once again he would take care of it.

25. In February 2012, EY requested a report of all control failures from 2011.

26. Upon receipt of this request, Pruett asked Chase Pittman ("Pittman"), the Director of Internal Audits, whether he should report the stock compensation issue to EY as a control failure. Pittman reminded Pruett that Phillips had instructed him not to report this control failure, and reiterated Pruett was not to report this failure to EY or anyone else because Phillips "was the boss" and did not want it reported.

27. Following this conversation, Pruett began to believe the stock compensation issue would not be properly investigated or reported.

28. This failure to report added to a growing concern that Pruett had about the integrity of BlueLinx's internal audit procedures, particularly the independence of the internal audit department under the leadership of Phillips.

29. Pruett, however, decided to continue to monitor the situation before taking any further action. Specifically he decided to check the minutes from the first two quarterly meetings of BlueLinx's Audit Committee to see if the stock based compensation issue he had reported to Yancey and Phillips had been reported or discussed with the Committee.

30. He checked the meeting minutes from both the February and May Audit Committee meetings when they became available in October 2012, and the stock based compensation issue was not reported or discussed at either meeting.

31. Accordingly, believing there had been a cover-up and violations of SOX and the Security Exchange Act's reporting requirements, on or about November 8, 2012, Pruett contacted the Public Company Accounting Oversight Board ("PCAOB") and reported the potential stock based compensation issue, as well as the failures to properly report that issue as a documented internal control failure.

32. On or about November 14, 2012, Pruett was interviewed by Rebecca J. Rhodes, an investigator with the PCAOB.

33. Following the interview, Pruett was informed that the PCAOB would begin an investigation of BlueLinx based on his tip.

34. On February 8, 2013, Pruett was contacted by Krysta Cannon, an accountant with the Atlanta Office of the SEC's Division of Enforcement, and informed that the PCAOB's investigation was complete, and that the matter had been referred to them to determine whether there had been any violations of federal securities law.

35. On March 26, 2013, the SEC, once again, contacted Pruett to schedule an interview and request further information.

36. On or about April 15, 2013, Pruett provided the SEC with a letter outlining the facts and circumstances surrounding the stock compensation issue, his attempts to report the issue as an internal control failure, his concerns that the

issue had been intentionally covered up by Phillips, and his concerns that the internal audit department as a whole lacked the independence and impartiality required under SOX and the Securities Exchange Act.

37. On or about April 25, 2013, Pruett provided an anonymous letter to Alan Schumacher, chair of the BlueLinx Audit Committee, informing the Audit Committee of his reports to the PCAOB, as well as his cooperation with the SEC's investigation. In that letter, Pruett made clear he had voluntarily cooperated with the SEC's investigation to that point, and clearly stated he was blowing the whistle under both SOX and the Dodd-Frank Act. He informed the Committee he would agree to meet with them, or their counsel, so long as they agreed to protect his identity and his job.

38. On or about April 30, 2013, Pruett received an email from the Audit Committee's attorney, Craig Carpenito ("Carpenito").

39. Carpenito's email informed Pruett that he had been retained to "investigate the allegations set forth in your letter." The email further requested a "private meeting" at the Atlanta Offices of Alston & Bird, LLP, before concluding, "[b]ecause you are a current employee, the meeting will be protected by the Company's Attorney-Client Privilege."

40. Pruett agreed to meet with Carpenito, after being reassured in yet another email that "we will keep this matter, your identity, and any materials

you provide…confidential until after tomorrow's meeting. At that point, we will need to share the information with the Audit Committee."

41. Pruett's meeting with Carpenito took place on May 2, 2012 at Alston & Bird, LLP's Atlanta offices. During that meeting Mr. Pruett detailed all of his concerns about BlueLinx's internal audit department, and reported, in detail, his whistleblowing activities to both the PCAOB and the SEC. During that meeting, he, once again, made clear he had reported this activity to both agencies as a whistleblower under SOX and Dodd-Frank, and expected to be protected as such.

42. Following his meeting with Carpenito, Pruett informed the SEC investigator, Krysta Cannon, about the meeting. On May 10, 2013 he received an email from Cannon, informing him she was conflicted out of any further involvement with the investigation because she was a former Alston & Bird employee, but that the investigation would be reassigned.

43. Upon information and belief, as of the filing of this complaint, the SEC'S investigation of BlueLinx is ongoing.

44. On or about May 13, 2013, Pruett returned from six weeks of approved FMLA leave due to a medical condition.

45. Immediately upon his return to the BlueLinx offices, he was asked to report to Human Resources to tender his fitness for duty paperwork.

46. In that same meeting, immediately after tendering the requested paperwork, he was terminated by the Vice President of Human Resources, James Soggs. Soggs informed Pruett that the he was being terminated for going to the SEC.

47. Lori Patten, Bluelinx's Director of Human Resources, confirmed the motivation for Pruett's termination in an email to him. In the email, Pruett stated to Patten "the Vice President of HR stated that I was being terminated 'for going to the SEC' when I should have done to the company first. It is very important to me that I always do the right thing. Can you tell me what the company believes I should have done instead of going to the SEC?" Patten responded, "[t]he proper procedure for reporting internal control issues would be to come through the company first to allow us the opportunity to investigate and resolve."

48. Pruett's termination was retaliation for Pruett's protected whistleblowing activity, both internally and to the PCAOB and the SEC.

49. Pruett's termination has caused him great emotional distress, has deprived him of a position he worked hard to achieve, and has caused him financial hardship.

## V.     CAUSE OF ACTION: VIOLATIONS OF DODD-FRANK WHISTLEBLOWER PROTECTION, 15 U.S.C.A. § 78U–6(H)(1)(A)

50.     Plaintiff hereby incorporates, by reference, paragraphs 6-49 as if set forth more fully hereinbelow.

51.     Plaintiff, as Defendant's Compliance Manager, had a reasonable belief that he had uncovered possible violations of securities laws and/or other Federal laws.

52.     Plaintiff reported those violations of securities laws and other Federal laws, first, internally to management at BlueLinx, then to the PCOAB and the SEC.

53.     Defendant punished Pruett for reporting and disclosing said perceived violations by terminating him from his position as Compliance Manager.

54.     Pruett's disclosures were made pursuant to a rule, law, or regulation subject to the SEC'S jurisdiction.

55.     Pruett's disclosures were required and protected by rule, law, or regulation within the SEC's jurisdiction.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant the following relief:

11

a) Issue a declaratory judgment that Defendant's termination of Plaintiff was a violation of the Whistleblower protections afforded him under the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C.A. § 78u–6(h)(1)(A);

b) Issue a preliminary and permanent injunction compelling Defendants to reinstate Pruett to his prior position, title, and pay grade;

c) Afford Plaintiff a trial by jury on all issues so triable;

d) Order that Defendants pay damages to Plaintiff, to compensate him for all harm arising from Defendants' actions, including all liquidated damages;

e) Order that Defendants pay punitive damages, due to the intentional and outrageous nature of their actions;

f) Order that Defendants pay Plaintiff's costs and a reasonable attorney's fee, pursuant to U.S.C.A. § 78u-6(h)(1)(C)(iii); and

g) Grant such other relief as the Court deems just and equitable.

Respectfully submitted, this August 7, 2013.

>*/s/ James Radford*
>James Radford
>Georgia Bar No. 108007

                                                  */s/ Caleb Gross*  
                                                  Caleb Gross  
                                                  Georgia Bar No. 960323

James Radford, LLC
545 N. McDonough St., Suite 212
Decatur, Georgia 30030
(678) 369-3609
james@jamesradford.com
caleb@jamesradford.com